UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | CRIMINAL CASE NUMBER: |
| v. | : | |
| | : | 3:15-cr-00204-RNC-1 |
| DAVID NIKOLASHVILI, | : | |
| *Defendant.* | : | February 23, 2018 |

## SENTENCING MEMORANDUM

David Nikolashvili, a 53-year-old man with no prior criminal history, pleaded guilty to false swearing in immigration matters, in violation of 18 U.S.C. § 1546(a).  He faces an advisory Guidelines range of 12 to 18 months' imprisonment.  He nonetheless seeks a sentence of time served – that is, 11 days of pretrial custody.  There are two bases for a downward departure: the combination of his specific offender characteristics (age, employment record, and family responsibilities) and substantial rehabilitation.  There are five bases for a variance, such as the Proposed 2017 Guideline Amendments, the BOP's disparate treatment of noncitizens, and the need to avoid unwarranted sentencing disparities.  This memorandum explains these and other bases for the requested sentence, but it first discusses Mr. Nikolashvili's history, characteristics, and offense conduct.

## MR. NIKOLASHVILI'S
## HISTORY, CHARACTERISTICS, AND OFFENSE CONDUCT

Mr. Nikolashvili had a good childhood by many measures.  He shared – and continues to share – a close relationship with his parents and two sisters.  He describes his oldest sister, Vera, as his "twin," even though they were born two years apart.  And while his parents were strict by American standards, life at home was healthy and loving.  He performed well in school, enjoyed boxing, and remembers staying busy from dusk until well past dark.  Mr. Nikolashvili spent much

of his time outside of school on the farm, where he raised animals, milked the cows, and tended to

the grapes.  He spent seven years studying medicine at the Tbilisi Medical State University and

graduated with a degree in Narcology and Psychiatry in 1988, around the age of 23.  He got married

to a cousin's good friend, and he and his first wife had a son, Zaza.

It's important to remember, however, that Mr. Nikolashvili grew up in the former Soviet

Union, and life in the Soviet Union was drastically different from the United States.   The

Nikolashvilis did not own real property.  "Under the state system, designated plots were leased to

farmers and town dwellers for private crop and livestock raising."  Curtis, Glenn E., *Armenia,*

*Azerbaijan, and Georgia*, Federal Research Division, Library of Congress (March 1994) at 198.

Private property existed, but access to goods easily found here were forbidden and could only be

obtained on the black market.  Education was free but "inseparable from politics, and the schools

were deemed an important tool in remaking society along Marxist-Lenin lines."  *Id.*  Freedom of

expression, assembly, religion, and movement were highly circumscribed.

So what did this mean for Mr. Nikolashvili?  It meant living in a society where he could

not discuss the ideas that he passionate about, such as democracy and freedom.  It meant that he

still struggled financially despite his education and medical training.  It meant that his patients

struggled even more than him.  According to his sister,

> [David] was [also] working as an independent driver in a car (similar to an Uber
> driver) and all of the money he was getting from there, he would donate it to
> ambulances for gas, because back at that time the hospitals and ambulances were
> so poor that couldn't afford for gas, hospitals weren't getting any financial help
> from the Government or anyone else. And not only that but he would also buy
> medicines with his own money for the hospitals and the people who couldn't afford
> it.

Exhibit B (Vera Papavasileiou Letter).

Mr. Nikolashvili engaged in pro-democracy protests around this time and was arrested as a result.  After being released from custody, he fled to Greece, leaving behind his first wife and their son who he had hoped would join later join them.  Mr. Nikolashvili found work as a cook for several years, and while he was living in Greece, his first wife remarried.  His first wife, however, still holds him in high regard.  *See* Exhibit C (Ketevan Katsitadze Letter) ("Despite all our difference I must say that he is a good person, very good father, caring and loyal.").  And he still continued to provide for his oldest son.  *See* Exhibit D (Zaza Nikolashvili Letter) ("We haven't seen each other for a long time now, but he always keeps in touch with me like he has done for so many years.").  Mr. Nikolashvili eventually returned to Georgia for five years before coming to the United States.  In those five years, he remarried and had twin sons, Giorgi and Besarion.

When Mr. Nikolashvili arrived in the United States, he began living with a friend in Queens, New York.  He first found work as a cook in a Greek restaurant before securing a masonry job at SAZ construction.  He suffered two work-related injuries as a mason.  He fell off a roof approximately 15 years ago and broke his leg.  About eight to ten years ago, he suffered a ruptured disc in his back which put him out of work and required surgery at Stamford Hospital.  These injuries and his advanced age led him to reconsider a career in construction, and he ultimately decided to obtain his Commercial Driving License.  He quickly found work with Cadence Premier Logistics, but in the early years, he struggled to make ends meet due to trouble finding reliable and consistent work and the cost of his lease, repairs, and insurance.

In 2010, around the same time that he decided to switch careers, he began engaging in the criminal activity at issue—that is, in exchange for money, he arranged sham marriages between citizens and noncitizens.  The citizens received a share of the money; the noncitizens obtained (or hoped to obtain) a chance at living the American dream.  Mr. Nikolashvili's criminal activity

spanned from 2010 until 2014.  During the last two years, Mr. Nikolashvili began to slow down until his criminal activity came to a gradual stop.  The government's investigation began before this time, around August 2013.   Mr. Nikolashvili, however, was unaware of the government's investigation until June 21, 2016 when Mr. Nikolashvili's truck was stopped at a weigh station.  At that time, he provided a voluntary, *Mirandized* statement to investigating agents, admitting to engaging in the criminal conduct at issue.

Mr. Nikolashvili was presented the following day in federal court and detained.  He was released over a week later, on July 1, 2016.  Since that time, he has continued to work as a truck driver, earning more and more money.  His previous employer thought highly of him.  "He is a very responsible person and we are looking forward to work with him in the future."  Exhibit E (Cadence Letter).  In October 2017, he moved employers and started working for State Express where he now works 70 to 80 hours per week.  According to his current employer,

> During his tenure in the demanding field of logistics, David established himself as a valuable asset to the successful performance of the entire organization.  David has shown an extraordinary sense of responsibility to adhere to safety requirements when driving, be courteous to clients, and treat goods with care.  Indicating high alertness and ability to work independently, David has demonstrated excellent customer service skills when dealing with clients who are either shipping or receiving freight carried in the truck.  In addition, David [Nikolashvili] has a proven record of being able to easily manage stress, as the occupation is one that can be highly stressful.  Furthermore, David has been very responsible by consistently making all pick-ups and deliveries on-time.  Finally, being technically inclined, David Nikolashvili demonstrated the ability to perform maintenance tasks that help ensure the truck meets compliance and other safety standards.

Exhibit F (Arnold Gabrenas Letter).

Mr. Nikolashvili has used his time of pretrial release to save money and help support his family back in Greece and Georgia.  *See* Exhibit G (Chrysanthi Papavasileiou Letter) ("There were so many times we didn't have money to buy groceries. . . And my uncle was the one who would not only send us money but wouldn't accept us to pay him back.").  According to his second wife,

> What I can say about this person, which I have known for years is that he is a very, very kind man. This is proved with his actions, for all these years he has been such a careful father, he calls us every week and helps us not only materially but also mentally.

Exhibit H (Natela Nikolashvili). And despite working hard to support his family, "he always finds time and energy to call us and talk to us for hours, giving us advice about our life and our future." Exhibit I (Giorgi Nikolashvili); *see also* Exhibit J (Besiki Nikolashvili).

Mr. Nikolashvili "fully realize[s] the gravity of his offense and . . . deeply regrets [his] actions." Exhibit A (David Nikolashvili Letter). He is prepared to accept whatever sentence this Court chooses to impose because he "know[s] it is well-deserved and fully justified." *Id.* And while this conviction places him at risk of removal, he hopes to continue working and pursuing the American dream if at all possible. According to him,

> I would like my life to be useful – not only to myself and my family, but also to the country that I have come to love as my second Homeland. I love this country not only because it has given me opportunities to realize my potential in life, and not only because the United States is the place that many people on this planet dream of calling their home, but also because it is the most civilized and democratic state that has ever existed; it is the most multinational and multiracial country, which most closely reflects the beliefs and ideals that I hold dear.

*Id.*

## **DISCUSSION**

The principles governing sentencing are well established. "In *United States v. Booker*, the Supreme Court held that the mandatory application of the Sentencing Guidelines was incompatible with the Sixth Amendment." *United States v. Cavera*, 550 F.3d 180, 187 (2d Cir. 2008) (citing *United States v. Booker*, 543 U.S. 220, 226–27 (2005)). The Second Circuit then set forth the model for sentencing in a post-*Booker* world. *See United States v. Crosby*, 397 F.3d 103 (2d Cir. 2005), *abrogated on other grounds by United States v. Fagans*, 406 F.3d 138 (2d Cir. 2005). Briefly, there are now three types of sentences. *Id.* at 111 n.9, 113. First, there are within-

Guidelines sentences. *Id.* Second, there are above- and below-Guidelines sentences, which are sentences resulting from permissible departures under the Guidelines. *Id.* Third, there are non-Guidelines sentences, which are sentences falling outside the Guidelines range without a permissible basis for departure. *Id.* Before imposing a sentence, "a sentencing judge must consider the factors specified in 18 U.S.C. § 3553(a). . . ." *Fagans*, 406 F.3d at 141 (citing *Crosby*, 397 F.3d at 110–12).

The United States Probation Office has properly calculated an advisory Guidelines range of 12 to 18 months' imprisonment, resulting from Offense Level 13 and Criminal History Category I. Mr. Nikolashvili nonetheless seeks a sentence of time served.[1] There are compelling reasons for a departure, variance, or both. This memorandum first addresses two bases for downward departure: specific offender characteristics and substantial rehabilitation. The memorandum next addresses five bases for variance, such as the Proposed 2017 Guideline Amendments, the BOP's disparate treatment of noncitizens, and the need to avoid unwarranted sentencing disparities. The memorandum finally argues that a sentence of time served is appropriate based on the totality of the 3553(a) factors.

## II.    There Are Two Bases to Depart Downwardly: the Combination of Specific Offender Characteristics (Age, Employment, and Family Ties) and Substantial Rehabilitation.

In *Koon v. United States*, 518 U.S. 81, 94 (1996), the Supreme Court explained that the Sentencing Guidelines apply only to a "heartland" of typical cases. "Atypical cases were not 'adequately taken into consideration,' and factors that may make a case atypical provide potential bases for departure." *Id.* (citations omitted). A district court may depart below the Guidelines

---

[1] Mr. Nikolashvili also seeks a Guidelines term of supervision, fine, and special assessment. This memorandum addresses those non-incarceratory portions of his sentence to argue that those other forms of punishment are adequate to satisfy the purposes of sentencing.

range if it finds "a mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines."  18 U.S.C. § 3553(b); U.S.S.G. § 5K2.0(b).

There are two grounds for departure in this case.  First, Mr. Nikolashvili's age, employment record, and family responsibilities, when considered in combination, are present to a substantial degree and make the case exceptional.  Second, Mr. Nikolashvili has substantially rehabilitated himself while on pretrial release by engaging in lawful employment, living frugally, saving, and helping to support his family.  Both arguments are addressed in turn.

A.   *Mr. Nikolashvili's age, employment record, and family responsibilities, when considered in combination, are present to a substantial degree and make this case an exceptional one.*

The Sentencing Commission has identified "characteristics . . . relevant in determining whether a sentence outside the applicable guideline range is warranted."  U.S.S.G., Chapter Five, Part H, Introductory Commentary.   The Guidelines identify three permissible grounds for departure: age, employment record, and family responsibilities, which all go hand-in-hand here. U.S.S.G. §§ 5H1.1, 1.5–1.6.   When multiple permissible characteristics form the basis for departure, a district court may depart from the Guidelines if those circumstances are "present to a substantial degree" and "make the case an exceptional one."  U.S.S.G. § 5K2.0(c).

At the age of 53, Mr. Nikolashvili is substantially older than most defendants.  And despite his age, he works the equivalent of two full-time jobs.  And his employment is not a desk job, it requires long, lonely hours on the road.  He works so hard because he wants to help support his family in Greece and Georgia who still rely on his support.  All of these factors are not only present to a substantial degree, but they make this case exceptional.   Incarceration would end Mr. Nikolashvili's employment and cause undue hardship to his family.  And his advanced age makes

it all the more difficult for him to pick up where he left off.  For these reasons, the combination of these conditions makes a downward departure appropriate.

        B.      *A Downward Departure Is Further Supported by Mr. Nikolashvili's Extraordinary Rehabilitation.*

Another way to view Mr. Nikolashvili's specific offender characteristics is extraordinary rehabilitation, which also constitutes a well-established basis for a downward departure.  *See*, e.g., *United States v. Wong*, 40 F.3d 1347, 1382 (2d Cir. 1994) ("[I]t is well established that a district court should consider a defendant's potential for rehabilitation in determining a sentence.").  In *United States v. Core*, 125 F.3d 74, 76 (2d. Cir. 1997), the Second Circuit observed that the "awareness of one's circumstances and the demonstrated willingness to act to achieve rehabilitation, thereby benefitting the individual and society, can remove a case from the heartland of typical cases, thus constituting a valid basis for departure."  *Id.*

Mr. Nikolashvili has been on pretrial release since July 1, 2016.  During this time, he has not had a single instance of misconduct and has done almost nothing but work and live simply.  He has used his savings to help his family in Greece and in Georgia.  According to his niece, "[t]here were so many times we didn't have money to buy groceries. . . And my uncle was the one who would not only send us money but wouldn't accept us to pay him back."  Exhibit G.  He continued to provide for his second wife, despite their divorce, and his two sons who are studying medicine.  And, as a result of his savings, he is able to pay a fine within the Guidelines range.  Suffice it to say, he has recognized the need for change and has done everything in his power to turn his life around.  With these changes, he is much less likely reoffend.  *See Doe v. United States*, 168 F.Supp.3d 427, 429 (E.D.N.Y. 2016) ("Participation in pro-social behaviors like employment, education and civic engagement—the very things that people with criminal records are often barred from participating in—actually reduce[s] recidivism." (citation omitted)).

**II**     **There Are Five Bases to Vary Downwardly, Such As the 2017 Proposed Guideline Amendments for First Offenders, the BOP's Disparate Treatment of Noncitizens, and the Need to Avoid Unwarranted Sentencing Disparities.**

The arguments discussed above constitute bases for departure as well as variance because those circumstances bear directly on the Section 3553(a) factors.  The Guidelines, however, prohibit departures in some circumstances, even if a fact would be relevant to the factors a district court must consider before imposing a sentence.  For example, where, as here, a defendant falls in Criminal History Category I, the district court may not depart on the basis of recidivism.  U.S.S.G. § 4A1.3(b)(2)(A).  A district court, however, may still impose a non-Guidelines sentence on this basis.  *See United States v. Jones*, 460 F.3d 191, 194 (2d Cir. 2006) ("With the entire Guidelines scheme rendered advisory by the Supreme Court's decision in *Booker*, the Guidelines limitations on the use of factors to permit departures are no more binding on sentencing judges than the calculated Guidelines ranges themselves.").  A district court may still impose a non-Guidelines sentence in those cases because a defendant's risk of recidivism bears directly on the need to protect the public from his future crimes.

There are five bases for a downward variance in this case.  First, statistically speaking, Mr. Nikolashvili is unlikely to recidivate: he is 53 years old, has a lifelong history of employment, has been married, graduated from college, has never used illegal drugs, and is a first offender.  Second, the 2017 Proposed Guidelines Amendments recommended a lower Guidelines range and a sentence other than imprisonment for first offenders like Mr. Nikolashvili.  Third, the concept of incremental punishment justifies a non-Guidelines sentence, especially when imposed in conjunction with a Guidelines term of supervised release and a fine.  Fourth, if incarcerated, Mr. Nikolashvili will spend more time in custody under harsher conditions than a United States citizen

receiving the exact same sentence.  Fifth, the majority of people sentenced under section 2L2.1 received a below- or non-Guidelines sentence.

> A.   *Statistically speaking, Mr. Nikolashvili is unlikely to recidivate: he is 53 years old, has a lifelong history of employment, has been married, graduated from college, has never used illegal drugs, and is a first offender.*

Many courts have relied upon recidivism statistics from the United States Sentencing Commission in deciding to impose a below- or non-Guideline sentence.  *See*, *e.g.*, *United States v. Aguilera*, 2008 WL 4830802, at *3 (E.D. Wis. Oct. 28, 2008) (citing U.S. Sentencing Commission, *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines*, (May 2004) [hereinafter, "*Recidivism Report*"]); *United States v. Germosen*, 473 F.Supp.2d 221, 227 (D. Mass. 2007) (citing *A Comparison of the Federal Sentencing Guidelines Criminal History Category and the U.S. Parole Commission Salient Factor Score* 15 (Jan. 4, 2005)); *cf. United States v. Payton*, 754 F.3d 375, 379 (6th Cir. 2014) (vacating and remanding for resentencing because district court imposed above-Guidelines sentence without addressing Sentencing Commission's recidivism statistics on age).  Relying on statistical analyses in numerous categories over a fifteen-year period, the Sentencing Commission has found that recidivism rates are strongly correlated with various factors.  *See Recidivism Report*.  Many factors suggest that Mr. Nikolashvili is statistically unlikely to recidivate: he is over the age of 50, is currently employed, is divorced, has never used illicit substances, and is a first offender.

The Sentencing Commission's statistics show lower levels of recidivism among older offenders in general and more specifically among those in Criminal History Category I. *Recidivism Report* at 12.  Mr. Nikolashvili, who is 53, is older than most federal defendants. Offenders over the age of 50 have a recidivism rate of 9.5 percent, while offenders under age 21 have a recidivism rate of 35.5 percent.  *Id.* at 28 (Ex. 9).  In Criminal History Category I, the

recidivism risk of offenders under 21 is 29.5 percent, but the recidivism risk for offenders over 50 is merely 6.2 percent. *Id.* Thus, Mr. Nikolashvili's age strongly suggests that he is unlikely to recidivate and hence that the Guidelines overstate the need to protect the public. *See Payton*, 754 F.3d at 379 (holding that district court committed procedural error in failing to consider the Sentencing Commission's recidivism statistics on age).

Employment, education, marriage, and abstinence from illicit drugs also predict a low likelihood of recidivism, both generally and specifically among offenders in Criminal History Category I. *Id.* at 29 (Ex. 10). Mr. Nikolashvili possesses all these attributes. Criminal History Category I offenders with stable employment are less likely to recidivate (12.7%) than similarly situated offenders who were unemployed (20.6%). *Id.* So, too, with college graduates: they are less likely to recidivate (7.1%) than offenders without at high school education (21.3%). *Id.* Likewise, married and divorced offenders both had only a 9.8 percent risk of recidivating, compared to a 22.7 percent rate for those who were never married. *Id.* Offenders who abstained from illicit drugs too showed markedly lower rates of recidivism. *Id.* Only 10.8 percent of offenders who did not use illicit drugs reoffended, whereas 21.9 percent of offenders who had used illegal drugs one year prior to their offense reoffended. *Id.*

The most important factor, however, is Mr. Nikolashvili's lack of any prior criminal history. His criminal history score does not sufficiently capture why there is little need to protect the public from future crimes. *See Recidivism Report* at 35. "There is a demonstrable difference in the recidivism rates of real first offenders as compared to other defendants in Criminal History Category I." *Germosen*, 473 F. Supp.2d 221, 227 (citing Michael Edmund O'Neill, *Abraham's Legacy: An Empirical Assessment of (Nearly) First-Time Offenders in the Federal System,* 42 B.C. L.REV. 291 (2001) [hereinafter, "O'Neill, *Abraham's Legacy*"]). Offenders with "no prior

convictions or reported contact with the criminal justice system are lumped together in Criminal History Category I with offenders who may be recidivists or who may have prior violent felonies," and the latter category of offenders are more likely to "demonstrate recidivist behavior."  O'Neill, *Abraham's Legacy*, 42 B.C. L.REV. at 293–94.

The Sentencing Commission's more recent studies confirm this research.  *See* U.S.S.C., *The Past Predicts the Future: Criminal History and Recidivism of Federal Offenders* (May 2017), available    at    https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2017/20170309_Recidivism-CH.pdf.  Here are the key findings applicable to Mr. Nikolashvili:

> There are substantial differences in recidivism rates among groups of offenders in CHC I.  Among offenders with zero points and no prior contact with the criminal justice system, there is an 11.7 percentage point difference in rearrest rates. Between offenders with zero criminal history points and some criminal history and one-point offenders there is a 10.4 percentage point difference. Overall, there is a 22.1 percentage point difference in rearrest rates between offenders with no criminal history and one-point offenders. These differences within CHC I are substantially larger than the differences within other CHCs. In addition, offenders with zero points have a longer median time to rearrest and a less serious offense of rearrest than offenders with one criminal history point (public order vs. assault).

*Id.* at 14.  Thus, for people with no prior criminal history, "a sentence other than imprisonment is generally appropriate." American Bar Association, *A Report on Behalf of The American Bar Association Task Force on The Reform of Federal Sentencing for Economic Crimes*, available at http://lawprofessors.typepad.com/files/ussc-presentation-9-17-13.pdf.

> **B.**     *The 2017 Proposed Amendments Recommended a Sentence Other Than Imprisonment for First Offenders like Mr. Nikolashvili.*

Research on recidivism has led the Sentencing Commission to propose several amendments for first offenders.  *See* U.S.S.C., *Proposed Amendments to the Sentencing Guidelines*, (Dec. 2016) ("Recidivism data analyzed by the Commission indicate that "first

offenders" generally pose the lowest risk of recidivism). The Proposed 2017 Amendments, which incorporated these recidivism statistics, did not take effect on November 1, 2017 because the Sentencing Commission lacked a quorum of voting members. The Proposed 2017 Amendments are nonetheless appropriate bases for variance. *See United States v. Preciado*, 590 F. App'x 654 (8th Cir. 2015) (affirming sentence where the district court granted "a downward variance based on an anticipated amendment to the Sentencing Guidelines"). Three proposed amendments are relevant here.

First, the Proposed 2017 Amendments recommended one- or two-point decreases to the total offense levels for individuals who have never been convicted of a prior criminal offense. *See* 2017 Proposed Amendments, U.S.S.G. § 4C1.1. With a one-level decrease, the Guidelines drop to 10–16 months' imprisonment; with a two-level decrease, the Guidelines drop to 8–14 months' imprisonment. *See* U.S.S.G. § 5A (Sentencing Table). Second, the Proposed 2017 Amendments recommend combining Zones B and C. *See* Proposed 2017 Amendments, U.S.S.G. § 5A. With this amendment, Mr. Nikolashvili's current offense level of 12–18 months' imprisonment, qualifies for a sentence of probation under the current Guidelines table. *See* U.S.S.G. § 5B1.1 (Imposition of a Term of Probation). Third, and most significantly, the amendments adopt the following policy statement: **"the court ordinarily should impose a sentence other than a sentence of imprisonment . . . ."** Proposed 2017 Amendments, U.S.S.G. § 5C1.1(g) (emphasis added). These amendments will not go into effect in the foreseeable future because the Sentencing Commission lacked a quorum of voting members in 2017 and the newly constituted Sentencing Commission chose not to propose these changes for 2018. But the mere existence of these proposed amendments, and the basis for them, should give the Court confidence that the

Guidelines overstate the need to protect the public and that a downward variance to time served is a justifiable sentence.

> C.    *The Concept of Incremental Punishment Justifies the Requested Sentence – That Is, Eleven Days of Pretrial Incarceration, Nearly Two Years of Pretrial Supervision, a Guidelines Term of Supervised Release, a Fine within the Guidelines Range, and $100 Special Assessment.*

A sentence of 12 to 18 months' imprisonment would be unnecessarily excessive because Mr. Nikolashvili has never been incarcerated.  In *United States v. Mishoe*, 241 F.3d 214, 220 (2d Cir. 2001), the Second Circuit stated:

> Obviously, a major reason for imposing an especially long sentence upon those who have committed prior offenses is to achieve a deterrent effect that the prior punishments failed to achieve. That reason requires an appropriate relationship between the sentence for the current offense and the sentences . . . for the prior offenses.

*Mishoe* specifically addressed the Career Offender Guidelines, but its concept of incremental punishment applies here.  *See United States v. Castaneda*, 191 F. App'x 15, 18 (2d Cir. 2006) (observing that *Mishoe* permits "a departure pursuant to § 4A1.3 . . . 'if the sentencing judge determines, in the exercise of [his] discretion,' that the defendant's criminal history category 'overstates the seriousness of his criminal record.' (emphasis omitted) (quoting *Mishoe*, 241 F.3d at 215)).  Where an individual has never been incarcerated prior this offense, a Guidelines range recommending 12 to 18 months' imprisonment is too severe.  *See United States v. Cabrera*, 567 F.Supp.2d 271 (D. Mass. 2008) (granting 24-month variance, in part, because defendant in drug sting was a first-time offender).  There is no reason to believe that such a sentence would be more effective than the requested sentence – that is, 11 days of incarceration, almost two years of pretrial supervision, further supervision (or deportation), a fine within the Guidelines range, and $100 special assessment – because there is no point of comparison or historical example to disprove the efficacy of a lower sentence.

D.     *If Incarcerated, Mr. Nikolashvili Will Spend More Time in BOP Custody under Harsher Conditions than a United States Citizen Receiving the Exact Same Sentence.*

Mr. Nikolashvili's immigration status means that he will serve a prison sentence differently from a United States citizen receiving the exact same sentence.  His immigration status alters the "just punishment" calculation in two different ways, neither of which are reflected in the Guidelines, *cf.* U.S.S.G. § 5H1.10, and all of which are proper bases for a below or non-Guidelines sentence, *see United States v. Smith*, 27 F.3d 649, 655–56 (D.C. Cir. 1994) (noting that "a downward departure may be appropriate where the defendant's status as a deportable alien is likely to cause a fortuitous increase in the severity of his sentence").

These two reasons go hand-in-hand.  Without citizenship, Mr. Nikolashvili will be ineligible for placement in minimum security camp.[2]  *See* BOP Policy Statement 5100.08 ("A male or female inmate who is not a citizen of the United States.  All long-term detainees will have this PSF applied. When applied, the inmate or the long-term detainee shall be housed in at least a Low security level institution.").  And because Mr. Nikolashvili is ineligible for minimum security placement, he will not be eligible for early release to a halfway house or Residential Reentry Management Center ("RRC").  *See Phuong Dong Duong v. Martin*, 2014 WL 1665012, at *2 (S.D. Miss. Apr. 25, 2014) ("A halfway house or RRC is considered a minimum security facility; therefore, an inmate who cannot be housed in a minimum security facility is ineligible. . . .").  Courts have ruled that these are permissible bases for a non-Guidelines sentence.  *See*, *e.g.*, *United States v. Navarro-Diaz*, 420 F.3d 581, 588-89 (6th Cir. 2005) (remanding case for re-sentencing

---

[2] It appears that Mr. Nikolashvili, despite the existence of a final order of removal, will be eligible to earn good-conduct time if his sentence is greater than one year.  *See* 28 C.F.R. § 523.20(d) (exempting people subject to deportation from literacy requirements ordinarily required to earn good-conduct time).

post-*Booker* where district court noted at sentencing that cases "involving defendants who will be deported result, in effect, in harsher time because they are not eligible for halfway house placement").

> E.      The Majority of People Sentenced under Section 2L2.1 Received a Below-
>         or Non-Guidelines Sentence.

Congress requires a sentencing court to consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6).  This command requires courts to consider disparities in sentencing on a "*national* level."  *United States v. Tejeda*, 146 F.3d 84, 87 (2d Cir. 1998).  In 2016, 130 individuals in the United States were sentenced pursuant to Section 2L2.1.  No one received a sentence higher than the recommended Guidelines.  Exhibit M (Table 50).  Less than 48% of people received within-Guidelines sentences.  *Id.*  More than 52% received a below- or non-Guidelines sentence. *Id.*  In other words, a below or non-Guidelines sentence is more in keeping with national standards than a Guidelines sentence.

## III.   A Sentence of Time Served is Appropriate in Light of All of the Section 3553(a) Factors.

Before imposing a variance, or any sentence for that matter, a district court must consider the factors set forth in 18 U.S.C. § 3553(a).  *See Crosby*, 397 F.3d. at 111 n.9, 113.  Key among those factors are the purposes of sentencing because Section 3553(a) begins with the requirement that "[t]he court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection."  In *United States v. Ministro-Tapia*, 470 F.3d 137 (2d Cir. 2006), the Second Circuit has expanded on this concept and explained that if the Court believes a lower sentence will be as effective as a higher sentence in serving the purposes of sentencing, it must choose the lower sentence.  *See id.* at 142 (observing that where a Guidelines

sentence is "in equipoise with [a] below-the-range sentence," parsimony clause requires imposition of the lower sentence).  This determination requires "'generosity of spirit, that compassion which causes one to know what it is like to be in trouble and in pain.'"  *United States v. Singh*, 877 F.3d 107, 121 (2d Cir. 2017) (quoting Guido Calabresi, *What Makes a Judge Great: To A. Leon Higginbotham, Jr.*, 142 U. PA. L. REV. 513, 513 (1993)).

A confluence of factors justify a sentence of time served.  These factors have been discussed at length.  Briefly, however, Mr. Nikolashvili possesses compelling characteristics: he is a hardworking, 53-year-old man who arrived in the United States almost two decades ago.  *See* 18 U.S.C. § 3553(a)(1).  He helps support his family in Greece and Georgia.  The offense is undoubtedly serious, but he committed his first criminal offense when he was transitioning careers after sustaining serious injuries.  *See id.*  He has since turned his life around, working the equivalent of two full-time jobs.  *See* 18 U.S.C. § 3553(a)(2)(B).

Mr. Nikolashvili will be sufficiently punished: he has spent time in criminal custody, has been supervised for nearly two years, could be subjected to further supervision (or deportation), and has agreed to pay a fine.  *See* 18 U.S.C. § 3553(a)(2)(A).  A more severe sentence would not result in greater deterrence of a first offender.  *See* Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime and Justice: A Review of Research 28–29 (2006) ("[I]ncreases in severity of punishments do not yield significant (if any) marginal deterrent effects. . . . Three National Academy of Science panels, all appointed by Republican presidents, reached that conclusion, as has every major survey of the evidence.").  And there can be no valid rehabilitative goal in imposing further incarceration.  *Compare* 18 U.S.C. § 3553(a)(2)(D) (requiring sentence "to provide the defendant with needed educational or vocational training, medical care, or other

correctional treatment in the most effective manner"), *with* 18 U.S.C. § 3582(a) ("[I]mprisonment is not an appropriate means of promoting correction and rehabilitation.").

In light of the facts at issue, a sentence of time served does not ignore the Guidelines or result in unwarranted sentencing disparities. *See* 18 U.S.C. §§ 3553(a)(4)(A)(i), (a)(6).  Instead, it gives effect to pertinent policy statements reflecting that the Guidelines inadequately address the unique circumstances at play in this case.  *See* 18 U.S.C. § 3553(a)(5)(A).  And a departure or variance would be consistent with the approaches of district court around the county.  *See* 18 U.S.C. § 3553(a)(6).  Indeed, as other courts have recognized, a sentence of time served gives effect to Congress's directive that first offenders should generally receive a sentence other than imprisonment. *See*, *e.g.*, *Germosen*, 473 F.Supp.2d at 227 (observing that Guidelines ignored Congress's directive pursuant to 28 U.S.C. § 944(j) "by redefining 'serious offense' in a way that was entirely inconsistent with prior practice" and "folding first-time offenders into criminal history category I").

While the government has argued that further imprisonment would satisfy the goals of 18 U.S.C. § 3553(a), it is clear that time served would better satisfy those goals.  As the Second Circuit has held, if the sentencing court believes a lower sentence will be as effective as a higher sentence in serving the purposes of sentencing, it must choose the lower sentence.  *Ministro-Tapia*, 470 F.3d at 142.  Here, that sentence is time served.

## CONCLUSION

For the reasons stated above, Mr. Nikolashvili respectfully requests a sentence of time served, a Guidelines term of supervision, a Guidelines fine, and a $100 special assessment.

Respectfully Submitted,


THE DEFENDANT,
David Nikolashvili

FEDERAL DEFENDER OFFICE


Date: February 23, 2018

/s/ Ross Thomas
Assistant Federal Defender
10 Columbus Blvd, 6th FL
Hartford, CT 06106
Phone: (860) 493-6260
Bar No.: phv08740
Email: ross_thomas@fd.org


## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on February 23, 2018, a copy of the foregoing sentencing memorandum and exhibits were filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

/s/ Ross Thomas
Ross Thomas